## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| NUTMEG GAMING AND BINGO PRODUCTS, LLC, *Plaintiff*, | |
| v. | No. 3:22-cv-716 (JAM) |
| ABBOTT PRODUCTS INC. *et al.*, *Defendants*. | |

### ORDER RE MOTIONS TO DISMISS AND MOTION FOR PRELIMINARY INJUNCTION

This federal diversity case is about a dispute over the sale of a bingo game business. The plaintiff bought the business from one of the defendants but then their relationship went south. The plaintiff alleges breach of contract among many other claims against various defendants.

Two of the defendants have moved to dismiss for lack of personal jurisdiction. The plaintiff moves for a preliminary injunction. For the reasons set forth in this ruling, I will grant the two defendants' motions to dismiss and deny the plaintiff's motion for a preliminary injunction.

### BACKGROUND

Plaintiff Nutmeg Gaming and Bingo Products, LLC ("Nutmeg") has filed this lawsuit against numerous defendants: Abbott Products, Inc. ("Abbott"); John Lenzi, president of Abbott Products; Lisa Lenzi, wife of John Lenzi; Diamond Distributors, Inc. ("Diamond Distributors"); and Steven Stanford ("Stanford") d/b/a/ New England Bingo Supply.[1] Nutmeg is a limited liability company based in Connecticut and principally managed by Eric Leshine.[2]

---

[1] Doc. #12 at 1-2 (¶¶ 1-6). Nutmeg also alleged claims against George Martin but has withdrawn that claim. Doc. #49.

[2] Doc. #12 at 1 (¶ 1).

According to the amended complaint, Nutmeg and Abbott entered into an asset purchase and sales agreement in May 2020.[3] Abbott sells bingo supplies and equipment, and under the terms of the agreement Nutmeg agreed to purchase substantially all of Abbott's business assets.[4] These assets include:

- Equipment, machinery, bingo paper and bingo products, sealed tickets, general supplies, gaming products, inventory, and trucks and motor vehicles.[5] A bill of sale executed on December 20, 2021 specifies that these assets are to include a 10-foot wooden conference table, a 6-drawer 3-piece wooden desk, and 14 file cabinets of various sizes.[6]

- Customer contact records and files, including documents, tapes, software programs, and other information documenting the name, address, contact information and purchasing and account history of existing, previous, and prospective customers of Abbott Products.[7]

- Open or pending purchase orders identified in the bill of sale, as well as all contracts, indentures, licenses, agreements, commitments, bids, quotes, proposals, purchase orders, and sale orders.[8] The bill of sale states that this information is to include a copy of Quickbooks—an accounting software—with 3 years of customer history.[9]

- All rights, title, and interest in and to all contracts and/or purchase orders with vendors, and/or subcontracts, that will provide product to satisfy open purchase orders.[10]

- All rights to websites and social media accounts used by Abbott Products, including the website "abbottbingoproducts.com."[11]

The complaint further alleges that in December 2021 Nutmeg entered into a non-compete and confidentiality agreement with the Lenzis.[12] The agreement prohibits the Lenzis from unauthorized disclosure or misuse of "Confidential Information," which the agreement defines as Nutmeg's "trade secrets and proprietary information, financial results and information, processes

---

[3] *Id.* at 2-3 (¶ 10).
[4] *Ibid.*
[5] Doc. #12 at 3 (¶ 10); Doc. #12-1 (contract) at 2; Doc. #12-2 (bill of sale) at 5.
[6] *Id.* at 5.
[7] Doc. #12 at 3 (¶ 10); Doc. #12-1 at 2.
[8] Doc. #12 at 3 (¶ 10); Doc. #12-2 at 4.
[9] *Id.* at 6.
[10] Doc. #12-1 at 3.
[11] Doc. #12 at 3 (¶ 10); Doc. #12-1 at 4; Doc. #12-2 at 17.
[12] Doc. #12 at 3-4 (¶ 11).

and techniques, methods of doing business and information concerning customers and/or prospects of the Company, [and] identifying information regarding customers and/or prospects of the Company."[13] It also prohibits them from soliciting, encouraging, or inducing any customer and/or prospects to do business with a competitor of Nutmeg or to refrain from doing business with Nutmeg; interfering with the business relationship between Nutmeg and any customer; and divulging the names of Nutmeg's accounts to any person.[14]

The sale closed in December 2021, and the relationship between the parties soon soured. After the sale closed, Abbott and John Lenzi notified Diamond Distributors and Stanford that Abbott had sold its business to Nutmeg, including its rights and interests in the contractual agreements and relationships between Abbott and its customers and vendors.[15] Abbott and John Lenzi allegedly encouraged Diamond and Stanford to tell customers and vendors of Nutmeg to terminate their relationships with Nutmeg and to place future orders with Nutmeg's competitors.[16]

On March 8, 2022, John Lenzi told Nutmeg that he would prevent Nutmeg from accessing inventory stored at a Massachusetts business premise and prohibit Nutmeg from using that premise to do business.[17] On March 27, 2022, Nutmeg went to the Massachusetts business premise to remove certain business assets identified in the sales agreement—namely bingo flash boards, bingo consoles, a wooden desk, a wooden conference table, and file cabinets.[18] But upon arriving at the premise, Nutmeg discovered that John Lenzi had already removed those assets.[19]

---

[13] Doc. #12-3 at 3.
[14] *Id.* at 4.
[15] Doc. #12 at 9-10 (¶ 39).
[16] *Ibid.*
[17] *Id.* at 5 (¶ 15).
[18] *Id.* at 5-6 (¶ 18).
[19] *Ibid.*

On or around March 11, 2022, Abbott and John Lenzi allegedly instructed the host of the Abbott Products website and other social media and internet accounts to shut down those accounts, without transferring any of the account information to Nutmeg as required by the sales agreement.[20] At some point after close of purchase, Abbott and John Lenzi also posted a message on the Abbott Products website notifying customers that the Abbott Products business had been sold and directing customers to contact Diamond Distributors to fulfill future orders.[21] Nutmeg has attached to its complaint a screenshot of this auto-reply message, which reads: "If you are in need of Bingo Supplies or Products please call Diamond Distributors at 1-800-860-3887. This business as [sic] been sold and this Email Account is no longer monitored."[22]

On April 12, 2022, Nutmeg emailed Diamond and Stanford a letter advising them that Nutmeg was aware that Abbott and John Lenzi had disclosed confidential Nutmeg customer information to Diamond and Stanford in violation of the confidentiality agreement, and had also directed Diamond and Stanford to contact Nutmeg customers to solicit orders.[23] The letter directed each party to "provide [Nutmeg] with the names of any such business customers or accounts" who have contacted the defendants or were referred to them directly or indirectly by John Lenzi or any other former employees of Abbott Products.[24]

Finally, Abbott has refused to provide Nutmeg with "Quickbooks" financial software containing three years of customer history, inhibiting Nutmeg's ability to carry on with the business operations purchased from Abbott.[25] John Lenzi has also retained pieces of U.S. mail,

---

[20] *Id.* at 4 (¶ 13).
[21] *Id.* at 6-7 (¶ 20).
[22] Doc. #12-10 at 2.
[23] Doc. #12 at 6 (¶ 19).
[24] Doc. #12-9 at 4.
[25] Doc. #12 at 4 (¶ 13).

including customer check payments belonging to Nutmeg, which he has refused to turn over to Nutmeg.[26]

Abbott and the Lenzis largely dispute these allegations of the amended complaint.[27] It is not necessary at this time, however, for me to detail their counter-version of the events.

The amended complaint alleges several counts. Count One alleges a claim for injunctive relief. Counts Two and Three allege claims for breach of the sales agreement and confidentiality agreement against Abbott and the Lenzis. Count Four alleges fraud against Abbott and John Lenzi. Count Five alleges conversion against Abbott and the Lenzis. Counts Six and Seven allege tortious interference with contract and business expectancies against Stanford and Diamond Distributors. Counts Eight and Nine allege claims for violation of the Connecticut Uniform Trade Secrets Act and the Connecticut Unfair Trade Practices Act against Abbott and the Lenzis.

Stanford and Diamond Distributors have moved to dismiss. Nutmeg has moved for a preliminary injunction. Following a hearing at which I heard from all parties, this ruling follows.[28]

---

[26] *Id.* at 6-7 (¶ 20).

[27] Doc. #35 at 2-8.

[28] At the hearing on the motion for preliminary injunction, the parties chose to present oral argument rather than additional evidence. Although the parties offer competing versions of the facts, this ruling denying the motion for preliminary injunction assumes the truth of the facts alleged by Nutmeg to the extent that the facts alleged are not wholly conclusory and concludes that these facts are not sufficient to justify relief. Accordingly, an evidentiary hearing is not required prior to denial of the motion for preliminary injunction. *See Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 512 (2d Cir. 2005); *Maryland Cas. Co. v. Realty Advisory Bd. on Lab. Rels.*, 107 F.3d 979, 984 (2d Cir. 1997).

DISCUSSION

I will first address the jurisdictional motions to dismiss filed by Stanford and Diamond Distributors. Then I will turn to Nutmeg's motion for a preliminary injunction.

### *Stanford motion to dismiss*

Stanford has moved to dismiss in part for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).[29] A court may lack personal jurisdiction over an out-of-state defendant if the defendant is not subject under state law to the "long-arm" jurisdiction of the courts of that State, or if exercise of jurisdiction over the defendant would not comport with constitutional principles of fairness and due process. *See generally U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 149 (2d Cir. 2019); *Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016).[30]

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of making a *prima facie* showing that jurisdiction exists, including averments of facts that—if credited—would suffice to establish jurisdiction over the defendant. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018). While a court must assume the truth of the plaintiff's factual allegations, "[v]ague and conclusory allegations in a pleading are insufficient to establish personal jurisdiction." *Simonson v. Olejniczak*, 2022 WL 6509428, at *2 (D. Conn. 2022).

Stanford is a citizen and resident of Massachusetts, and he does business there under the name New England Bingo Supply.[31] Nutmeg contends that the Court may exercise personal

---

[29] Docs. #19, #20.
[30] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[31] Doc. #19-1 at 2.

jurisdiction over Stanford "based upon the alleged tortious actions occurring in Massachusetts which resulted in injuries to the Plaintiff in Connecticut."[32]

Under Connecticut's long-arm statute, "a court may exercise personal jurisdiction over any non-resident individual . . . who in person or through an agent . . . commits a tortious act outside the state causing injury to a person or property within the state . . . if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Conn. Gen. Stat. § 52–59b(a)(3).

The complaint alleges in nothing but conclusory fashion that Stanford did anything wrong. It says that Nutmeg sent a cease-and-desist letter to Stanford (among others) stating that Nutmeg "was aware" that Abbott and John Lenzi had "disclos[ed] confidential Nutmeg customer information" to Stanford and that Nutmeg had "actively directed" Stanford "to contact Nutmeg customers."[33] But it does not allege facts to explain how Nutmeg was "aware" of all this, and it alleges no facts about such disclosure or about whether Stanford did anything to contact Nutmeg customers (apart from whether Abbott and John Lenzi "actively directed" it to do so).

To make out a *prima facie* case, a plaintiff must plead "non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffharts*, 604 F. App'x 16, 19 (2d Cir. 2015). But Nutmeg has not done so.

Neither has Nutmeg satisfied either prong (A) or (B) of sub-provision (a)(3). Indeed, Nutmeg's opposition to the motion to dismiss quotes only a portion of the long-arm statute and

---

[32] Doc. #39 at 8.
[33] Doc. #12 at 6 (¶ 19).

wholly ignores these additional requirements.[34] When a party fails even to acknowledge the complete governing legal standard, this is often a telltale sign that the party is in no position to meet that standard.

In any event, Nutmeg has not shown that Stanford has ever done business in Connecticut. Nor has Nutmeg alleged that Stanford took any actions which he reasonably expected to have consequences in Connecticut and that he otherwise derives substantial revenue from interstate commerce.

Nutmeg comes nowhere close to making the required showing for long-arm jurisdiction over Stanford. Because there is no statutory long-arm jurisdiction, I need not consider whether the exercise of jurisdiction would be consistent with constitutional due process or address Stanford's argument why the complaint fails to state plausible grounds for relief. Accordingly, I will grant Stanford's motion to dismiss for lack of personal jurisdiction.

### *Diamond Distributors motion to dismiss*

Diamond Distributors also moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction.[35] Because Diamond Distributors is an out-of-state company, it is subject to a different long-arm statute than the one that applies to an out-of-state individual like Stanford. According to Nutmeg, there is long-arm jurisdiction over Diamond Distributors under Conn. Gen. Stat. § 33-929(f)(3), which provides in relevant part that "[e]very foreign corporation shall be subject to suit in this state . . . on any cause of action arising . . . (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that

---

[34] Doc. #39 at 2.
[35] Doc. #32.

such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold."[36]

Diamond is headquartered and incorporated in Maine.[37] Diamond has "never had an office, employees, or a bank account in Connecticut, . . . does not do business in Connecticut," and "has never been licensed or registered to do business in Connecticut."[38]

Nutmeg does not contest these facts. Instead, Nutmeg has filed a two-page affidavit from Eric Leshine, stating that he obtained a sample of bingo paper sold to Atlas Paper Supply of Connecticut, a "former customer of . . . Abbott Products, Inc. whose account was assigned by the Defendant Abbott Products, Inc. to the Plaintiff Nutmeg."[39] Leshine sent the paper sample to a Canadian company, Servi-Jeux, a bingo paper manufacturer, who verified that it had sold that bingo paper to Diamond Distributors.[40]

Diamond has responded with its own affidavit from Roberto Carosielli, Vice President of Bingo Servi-Jeux.[41] The Carosielli affidavit states that three days after Bingo Servi-Jeux sent the original email to Leshine indicating that the sample of paper had been sold to Diamond Distributors, Carosielli realized that there was an error.[42] He sent a subsequent email to Leshine clarifying that he had gone back two years in their records and could not find any proof that

---

[36] Doc. #37 at 9 (asserting specific reliance on § 33-929(f)(3)).
[37] Doc #32-1 at 10.
[38] *Id.* at 4-5, 10.
[39] Doc. #36-1 at 1-2 (¶ 3). In its response to *Stanford's* motion to dismiss for lack of personal jurisdiction, Nutmeg avers that Diamond has continued to do business with former customers of Abbott, including Abington K of C, Pembroke K of C, Leominster K of C, Christ the King-Ludlow, Abington VFW, St, Mary's-Norton, MA, Auburn Elks, and Ludlow VFW. Doc. #39 at 4-5. But all of these customers appear to be based in Massachusetts, and Nutmeg offers no evidence to the contrary.
[40] Doc. #36-1 at 3 (¶ 3).
[41] Doc. #42-2.
[42] *Id.* at 1-2 (¶ 5).

Bingo Servi-Jeux had ever sold the paper to Diamond Distributors.[43] In reply, Nutmeg has done nothing to suggest that the error did not occur as Carosielli has acknowledged under oath.

The Second Circuit has emphasized that "in the absence of an evidentiary hearing" on the issue of personal jurisdiction, a district court must resolve any factual disputes in the plaintiff's favor, even where there is "plainly reason to question the authenticity" of the evidence the plaintiff has offered. *See Dorchester Financial Securities, Inc. v. Banco BRJ. S.A.*, 722 F.3d 81, 85-86 (2d Cir. 2013). In *Dorchester Financial*, the Second Circuit credited a letter allegedly written by the defendant consenting to jurisdiction in the State of New York as sufficient to plead a *prima facie* case of jurisdiction, even where other "evidence submitted to the district court tend[ed] to show that the . . . documents . . . were forgeries." *Ibid.* The court of appeals noted that "in the absence of an evidentiary hearing, it was error for the district court to resolve that factual dispute in [the defendant's] favor." *Id.* at 86.

It is troubling to say the least that Nutmeg continues to rely on the Leshine affidavit even though it conceded at oral argument that it has no grounds to discredit Carosielli's affidavit that he furnished mistaken information to Leshine. A lawyer should not continue to rely on facts that he has learned to be false even if he did not know of the falsity at the time of submission. *See* Conn. R. Prof. Cond. 3.3(a)(3).

In any event, even if I give Nutmeg the benefit of the doubt and assume that Diamond Distributors sold at least one order of paper to Atlas Paper Supply of Connecticut, this would still not be enough to establish jurisdiction, because § 33-929(f)(3) requires that the cause of action itself arise out of the foreign company's production, manufacture, or distribution of goods to be used or consumed in Connecticut. In other words, there must be a nexus between the cause of

---

[43] *Ibid.*

action alleged and the conduct of the defendant within the state. *See Success Sys., Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 53 (D. Conn. 2020); *Ebm-Papst, Inc. v. AEIOMed, Inc.*, 2009 WL 291012, at *6 (D. Conn. 2009). Nutmeg does nothing to show a nexus between its claims against Diamond Distributors for tortious interference and the purported sale by Diamond Distributors of bingo paper to a company in Connecticut.

The failure of Nutmeg's jurisdictional argument is hardly surprising because § 33-929(f)(3) was not enacted to allow foreign companies to be liable in Connecticut for engaging in tortious interference with contracts or business expectancies. Instead, § 33-929(f)(3) is a jurisdictional provision designed for product liability actions. "The purpose of Section 33-929(f)(3) is to enable Connecticut courts to exercise jurisdiction over manufacturers in product liability suits which did not themselves directly ship their products to Connecticut." *Metro Bus. Sys., LLC v. Planitroi, Inc.*, 2022 WL 2802333, at *3 (D. Conn. 2022). Nutmeg has based its jurisdictional argument on a provision that quite obviously does not apply to this type of case.

In the absence of any nexus between the cause of action and the alleged conduct of Diamond Distributors within Connecticut, there is no basis for long-arm jurisdiction over Diamond Distributors. Because there is no statutory long-arm jurisdiction, I need not consider whether the exercise of jurisdiction would be consistent with constitutional due process. Accordingly, I will grant the motion to dismiss of Diamond Distributors for lack of personal jurisdiction.

### Nutmeg's motion for preliminary injunction

Nutmeg moves for a preliminary injunction to enjoin all defendants from misappropriating its trade secrets and compelling Abbott and the Lenzis to comply with the

terms of their agreements with Nutmeg.[44] A preliminary injunction is an extraordinary remedy for which a plaintiff ordinarily bears the burden to show (1) irreparable harm, (2) a likelihood of success on the merits or a sufficiently serious question going to the merits and a balance of hardships tipping decidedly in the plaintiff's favor, and (3) that the balance of equities weighs in favor of granting an injunction. *See, e.g.*, *American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

The Second Circuit has reiterated that "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Irreparable harm is "harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Really Good Stuff, LLC v. BAP Invs., L.C.*, 813 F. App'x 39, 44 (2d Cir. 2020). A plaintiff must show that "absent a preliminary injunction it will suffer 'actual and imminent' injury that 'cannot be remedied if a court waits until the end of the trial,' such as through an award of money damages." *ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019).

Aside from repeated assertions of irreparable harm, Nutmeg has offered scant details about the nature or degree of its injury. It has adduced no evidence to support its motion other than the allegations of the verified complaint.

The first set of Nutmeg's requested injunctive relief relates to what it alleges is Abbott and the Lenzis' failure to transfer Abbott's business assets to Nutmeg as agreed to by the terms of the sales agreement. For example, Nutmeg seeks an order that Abbott and the Lenzis provide

---

[44] Doc. #13.

all password codes for Quickbooks software containing customer and vendor account information.[45] According to Nutmeg, without these passwords, it cannot operate the business it purchased from Abbott and the Lenzis.[46]

The problem, however, is that Nutmeg does nothing to show why its inability at this time to access and operate the business it purchased will result in no less than irreparable harm rather than harm that can be fully compensated by means of an award of money damages in the event that Nutmeg prevails on its claims at the conclusion of this case. The general rule is that "economic loss resulting from the inability to operate a business is compensable by damages and therefore constitutes no irreparable harm." *Alsop v. Desantis*, 2020 WL 4927592, at *4 (M.D. Fla. 2020); *see also Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63-64 (2d Cir. 2011) (affirming denial of preliminary injunction for lack of showing that closure of business would result in irreparable harm); *Tarvisium Holdings, LLC v. Dukat, LLC*, 2019 WL 2189519, at *2 (W.D. Mo. 2019) ("While Plaintiffs may not be able to operate the business in the interim without the injunctive relief they seek, an award of monetary damages, including damages for lost profits, can compensate them for this harm.").

Nutmeg does not identify any particular reason why its inability to run the business it believes it purchased will result in irreparable harm. For example, it has not shown that it would be particularly difficult to calculate damages because of a lack of sufficient business records and that there is an imminent risk of loss of reputation and good will. *See Dexter 345 Inc.*, 663 F.3d at 63; *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010). To the contrary, the three years of customer account information in the Quickbooks spreadsheets should provide sufficient data from which to calculate any monetary damages at the conclusion of the

---

[45] Doc. #13-1 at 7.
[46] *Id.* at 8.

litigation if Nutmeg prevails. Nutmeg is free to engage in the bingo business in general, and it does not show that the loss of its ability to extend its operations at this time to what was the Abbott bingo business will result in irreparable harm.

Nutmeg next requests that the Court order the turnover of all mail and customer deposits, invoice payments and/or checks for payment of purchase orders, 5-6 bingo flash boards, 5-6 bingo consoles, a 6-drawer wooden desk, a 10-foot wooden conference table, and 14 file cabinets.[47] But again it makes no showing that without these items it will suffer irreparable harm. If the defendants have invoice payments or checks in their possession, then the damages from the loss of these are readily calculable. Otherwise, litigants "facing the prospect of lost access to a particular good or service can generally find an adequate replacement elsewhere in the marketplace." *Pisarri v. Town Sports Int'l, LLC*, 758 F. App'x 188, 191 (2d Cir. 2019). So if Nutmeg needs flash boards, consoles, a desk, a table, or filing cabinets, it can go to Ikea or Home Depot or elsewhere and buy them. It does not suffer irreparable harm because the defendants will not turn these items over to Nutmeg.

Nutmeg argues that not being able to access the customer deposits prevents it from "properly accounting for said checks and payments" and "having knowledge of the contents of said U.S. Mail currently in the possession" of the defendants.[48] But without "some indication that failure to receive . . . payments . . . will result in some harm beyond the mere delay in payment," Nutmeg does not "establish that its injury cannot be compensated by monetary damages." *Conn. Mun. Elec. Energy Coop. v. Nat's Union Fire Ins. Co.*, 2022 WL 3716445, at *5 (D. Conn. 2022).

---

[47] *Id.* at 8.
[48] *Ibid.*

Nutmeg also seeks an order to require the defendants to assign to Nutmeg all websites, social media accounts, and other intellectual property associated with Abbott's bingo business.[49] But Nutmeg does not explain why its inability to access the Abbott website or social media accounts will cause it irreparable harm. It does not allege, for example, that the Abbott social media accounts would be indispensable to reaching potential customers and preserving its reputation and goodwill. *See, e.g.*, *JLM Couture Inc. v. Gutman*, 2022 WL 2914531, at *16 (S.D.N.Y. 2022) (finding irreparable harm where defendant continued to control social media accounts that were critical platforms for advertising, reputation, and goodwill).

Nor does Nutmeg show that it would have used the Abbott website to successfully market to potential customers. *See, e.g.*, *Mrs. United States Nat'l Pageant, Inc. v. Williams*, 353 F. Supp. 3d 213, 219 (W.D.N.Y. 2019) (no irreparable injury where plaintiff produced no evidence that prospective customers would have paid to sign up for the plaintiff's business if not for defendants' continued ownership of certain websites).

Nutmeg's next set of requested injunctive relief relates to the non-compete terms of the confidentiality agreement. Nutmeg alleges that Abbott and the Lenzis have violated the agreement by directing Nutmeg's customers to do business with Nutmeg's competitors and by competing directly or indirectly with Nutmeg.[50] But Nutmeg fails to detail the nature of this harm. Rather than attempting to substantiate the harm, it relies instead on a provision in the confidentiality agreement in which the parties agree that a violation of the agreement "will cause irrevocable harm to the Plaintiff Nutmeg for which no adequate remedy at law is available."[51]

---

[49] *Id.* at 7.
[50] *Id.* at 9-10.
[51] *Id.* at 11-12.

But "contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate." *See A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 337-38 (S.D.N.Y. 2013) (citing *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987)). An irreparable harm clause is "one factor that must be considered in deciding whether irreparable harm would result if an injunction did not issue," but on its own does not justify a finding of irreparable harm. *See Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*, 2019 WL 5257995, at *8 (S.D.N.Y. 2019).

Nutmeg offers no further details about the nature of the harm it will suffer absent an order enforcing the terms of the confidentiality agreement. To the extent it alleges violation of the non-compete provision, it does not adduce any facts to suggest that Abbott or the Lenzis are trying to compete with Nutmeg. Without more, the vague and conclusory irreparable harm clause is insufficient to support Nutmeg's motion for a preliminary injunction. *See Purugganan v. AFC Franchising, LLC*, 2020 WL 6946558, at *4 (D. Conn. 2020); *Home It, Inc. v. Wupin Wen*, 2019 WL 7168370, at *2 (E.D.N.Y. 2019).

Finally, Nutmeg seeks an order pursuant to Conn. Gen. Stat. § 35-52 directing all defendants to stop accepting purchase orders or requests from any customers or vendors whose accounts were assigned from Abbott to Nutmeg on December 20, 2021 and who were referred to them by Abbott or the Lenzis; and to turn over to Nutmeg any and all financial information regarding disputed orders.[52]

Section 35-52 provides that "[a]ctual or threatened misappropriation" of a trade secret "may be enjoined upon application to any court of competent jurisdiction." A trade secret is defined as "information, including a formula, pattern, compilation, program, device, method,

---

[52] *Id.* at 12-13.

technique, process, drawing, cost data or customer list" that (1) "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d).

Nutmeg provides little clarity about the trade secrets the defendants have allegedly misappropriated. The most plausible reading is that Nutmeg believes the identity of its customers and vendors, as obtained in its purchase from Abbott, are a "customer list" protected under the statute. But matters of general public knowledge are not trade secrets, and Nutmeg has not shown that Abbott's customers or vendors have been kept secret and that it would be difficult to learn of Abbott's customers or vendors absent improper means. *See E. Computer Exch., Inc. v. King*, 2022 WL 2527976, at *5 (D. Conn. 2022) (denying preliminary injunctive relief for failure to make such a showing).

In short, Nutmeg has not adduced facts to show that it will suffer irreparable harm, and—in the absence of any such showing—the remaining factors are not enough to warrant the grant of a preliminary injunction. In particular, the largely conclusory allegations of the complaint upon which Nutmeg relies do not carry Nutmeg's burden to show a likelihood of success. Because Nutmeg has not carried its burden, there is no need for me to address or resolve the contrary facts alleged by Abbott and the Lenzis in opposing the motion for preliminary injunction.[53] Accordingly, I will deny the motion for preliminary injunction.

---

[53] Doc. #35 at 2-8.

**CONCLUSION**

For the reasons stated above, the Court GRANTS Stanford's and Diamond Distributors's motions to dismiss (Docs. #19, #20, #32). The Court denies as moot Diamond Distributors's motion to strike the Leshine affidavit (Doc. #43). The Court denies Nutmeg's motion for a preliminary injunction (Doc. #13). It is so ordered.

Dated at New Haven this 9th day of January 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge